IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

OWEN M. GUY MANVILLE, III, et al., )
                                    )
                Plaintiffs,         )      2:08-cv-1931-GEB-DAD
                                    )
        v.                          )      ORDER
                                    )
COUNTRYWIDE FINANCIAL CORPORATION,  )
     et al.,                        )
                                    )
                Defendants.         )
_____)

        Plaintiffs' motion for a preliminary injunction was heard on
October 6, 2008.  The motion was filed on August 18, 2008, as both a
request for a temporary restraining order ("TRO") and a request for a
preliminary injunction ("PI").  Plaintiffs seek to prevent Defendants
from foreclosing, auctioning and selling Plaintiffs' "property located
at 12211 Sierra Drive, City of Truckee, County of Nevada, State of
California;" from "attempting to collect any money from plaintiffs on
the residential mortgage" for this property; from sending any
information regarding plaintiffs to any collection agency for purposes
of collection; from contacting plaintiffs about any debt; and, from
"issuing any notice to any collection or credit agency regarding
plaintiffs."  (Mot. at 10:7-15.)

Plaintiffs' request for a TRO enjoining the foreclosure proceeding against the property was granted in an Order filed August 20, 2008; that Order scheduled the PI hearing for September 4, 2008. Defendants neither filed an opposition nor appeared at the TRO hearing.  Subsequent to that hearing, Defendants and Plaintiffs stipulated to extend the TRO to October 6, 2008 and to have Defendants' Opposition due on October 1, 2008.  Defendants have opposed Plaintiffs' motion for a PI and counsel for both sides appeared at the PI hearing.

BACKGROUND

Defendants have submitted a declaration from Defendant Jose M. Delgadillo ("Delgadillo") in opposition to Plaintiffs' request for a PI, in which Delgadillo declares he was employed as an Account Executive at Full Spectrum Lending, a division of Defendant Countrywide Bank.  (Delgadillo Decl. ¶ 2.)  Delgadillo declares that Plaintiff Owen M. Guy Manville ("Owen Manville") was also an Account Executive at Full Spectrum during the time Delgadillo was employed there, and that Owen Manville "had more experience than most other Account Executives, and managed other Account Executives in addition to working directly with customers."  (Delgadillo Decl. ¶ 6.) Delgadillo accepted a position as a Home Loan Consultant at Defendant Countrywide Home Loans ("Countrywide") in January 2005, which is another division of Defendant Countrywide Bank.  (Delgadillo ¶ 2.) Delgadillo attests that in his position as Account Executive and Home Loan Consultant, he "was and [is] essentially a loan officer." (Delgadillo ¶ 3.)  He "contact[s] potential customers to explore opportunities to take out a home mortgage loan, or refinance an existing home mortgage loan [and] explain[s] loan products, the

1  ramifications of different loans, and the process for taking out a
2  mortgage loan." (Delgadillo Decl. ¶ 3.)

3        Delgadillo declares Owen Manville called Delgadillo at
4  Countrywide and left a message for Delgadillo. (Delgadillo Decl. ¶
5  8.) Delgadillo spoke with Owen Manville on July 24 or 25, 2006; Owen
6  Manville told Delgadillo that he wanted to refinance his home mortgage
7  loan for his real property located at 12211 Sierra Drive, Truckee,
8  California. (Delgadillo Decl. ¶ 9.) Delgadillo declares that Owen
9  Manville "knew exactly which Countrywide loan he wanted"; Owen
10 Manville specifically requested a "No Income, No Assets" ("NINA") loan
11 in the amount of $375,000, and "a loan with a fixed interest rate for
12 seven years, with an adjustable rate for the remaining 23 years of the
13 loan's duration." (Delgadillo Decl. ¶¶ 11, 12.) On July 28, 2006,
14 Owen Manville provided Delgadillo loan application financial
15 information. (Delgadillo Decl. ¶ 14.) Delgadillo declares
16 "Countrywide sets the loan interest rates every work day. The
17 interest rate that Countrywide offers depends on the customer's credit
18 rating, among other factors," and that Delgadillo has no discretion to
19 set the interest rate. (Delgadillo Decl. ¶ 16.) Delgadillo declares
20 he used Countrywide's system to determine that the interest rate for
21 the first seven years of the NINA loan for which Owen Manville was
22 applying was 7.25%. (Id.) Delgadillo declares that he informed Owen
23 Manville on July 28, 2006 that the interest rate for the first seven
24 years of the loan was 7.25%, and that he quoted him "a discount
25 percentage rate of 1.0%, or one "point" in mortgage parlance."
26 (Delgadillo Decl. ¶ 17.)

27        Plaintiffs have submitted a declaration from Plaintiff Helen
28 I. Manville ("Helen Manville"), in which she declares Delgadillo

1 │ "promised a loan with a 7% interest rate fixed for 7 years."

2 │ (Manville Decl. ¶ 3.)  No written document has been submitted

3 │ supporting Helen Manville's declaration that Delgadillo made this

4 │ promise, and the Good Faith Estimate prepared on August 2, 2006, which

5 │ Countrywide gave to Plaintiffs and which is attached to the Complaint,

6 │ contains a 7.25% interest rate.  (Compl. Exhs. B & D.)[1]

7 │        Delgadillo declares that within the next few weeks,

8 │ Countrywide sent an appraiser to estimate the value of Plaintiffs'

9 │ home.  The appraiser informed Delgadillo that the property was worth

10 │ $486,000, which was lower than the figure Owen Manville had provided

11 │ Delgadillo.  This meant that the loan-to-value ratio for the $375,000

12 │ loan was 77.16%, which was higher than the 75% maximum that

13 │ Countrywide allowed.  (Delgadillo Decl. ¶ 19.)  After receiving this

14 │ information, Delgadillo contacted Owen Manville to notify him of the

15 │ problem.  Owen Manville insisted on a loan of $375,000, "so

16 │ [Delgadillo] offered to request an exception from Countrywide with

17 │ respect to the 'LTV ratio.'  Manville agreed."  (Delgadillo Decl.

18 │ ¶ 20.)  Delgadillo declares on or about August 16, 2006, he requested

19 │ an exception from the Structured Loan Desk at Countrywide.  The

20 │ Structured Loan Desk agreed to the exception but required an

21 │ additional 0.25 "points" be added to the loan.  (Delgadillo Decl. ¶

22 │ 21.)  Defendants have submitted a copy of the Structured Loan Desk

23 │ Exception Summary which summarizes Delgadillo's request and

24 │ Countrywide's approval conditioned on the additional 0.25 "points."

25 │

26 │        [1]   Plaintiffs mislabeled the exhibits attached to their
27 │ Complaint.  The Complaint refers to the exhibits using one set of
    │ exhibit letters, yet the exhibits are labeled by hand using another set
28 │ of exhibit letters.  This Order refers to the exhibits to the Complaint
    │ according to the hand-written labels on the exhibits.

(Delgadillo Decl. Exh. A.)   Delgadillo declares that shortly
afterward, Delgadillo "contacted Owen Manville and informed him that
the exception had been granted, but that an additional 0.25 'points'
[would] be added to the loan as a condition for issuing the
exception."   (Delgadillo Decl. ¶ 21.)   Delgadillo declares Owen
Manville "accepted the additional points, and informed [Delgadillo]
that he wished to proceed with the Loan."   (Delgadillo Decl. ¶ 22.)
Helen Manville declares that Plaintiffs were "attempt[ing] to
refinance [their] home in order to consolidate payments and pay off
other bills."   (Manville Decl. ¶ 3.)

On August 18, 2006, Countrywide provided to Plaintiffs, and
Plaintiffs signed, a second Good Faith Estimate, a final Truth in
Lending disclosure statement, an Interest Only Adjustable Rate Note,
and a Deed of Trust with an Adjustable Rate Rider.   (Compl. Exhs. C,
E, H; Premachandra Decl. Exh. B.)   On August 23, 2006, Countrywide
provided Plaintiffs with a Settlement Statement.   (Premachandra Decl.
Exh. E.)

Plaintiffs received the loan, but after one year Plaintiffs
became delinquent on their loan payments.   (Manville Decl. ¶ 6.)
Countrywide had a Notice of Default recorded with Nevada County on
July 27, 2007.   (Premachandra Decl. Exh. O.)   Plaintiffs "sought a
loan modification agreement with Countrywide," and "[i]n a letter
dated October 15, 2007, Countrywide agreed to a loan modification and
provided paperwork for [Plaintiffs] to sign."   (Manville Decl. ¶¶ 6,
7).   "As part of the agreement, [Plaintiffs] were to pay $2,527 to
reinstate the mortgage [and the new monthly payment would be
$2,591.09]."   (Manville Decl. ¶ 7; see also Compl. Exh. I;
Premachandra Decl. Exh. P.)   Plaintiffs sent Countrywide a certified

cashier's check for $2,527 on October 23, 2007, which Countrywide
cashed on November 2, 2007.  (Manville Decl. ¶ 7 & Compl. Exh. K.)
Defendants have submitted a Notice of Rescission, recorded with Nevada
County on Countrywide's behalf on November 13, 2007, rescinding the
July 27, 2007 Notice of Default.  (Premachandra Decl. Exh. R.)

　　　　　Helen Manville declares that in early December, Plaintiffs
received a letter from Countrywide dated November 27, 2007, in which
Countrywide agreed to another loan modification, demanding $5,224.50
to reinstate the mortgage, and requiring $2,924.68 in monthly
payments.  (Manville Decl. ¶ 8.)  However, the record does not contain
the November 27, 2007 letter.  Helen Manville declares "it was clear
to [her] that Countrywide had not credited [their] payment or
reinstated [their] mortgage as . . . agreed."  (Manville Decl. ¶ 9.)
Helen Manville further declares, in December 2007, Plaintiffs were
informed that Plaintiffs had not sent the loan documents nor made the
required payment.  Plaintiffs then proved to Countrywide that
Plaintiffs had made the payment through the cashed cashier's check.
At that time, Plaintiffs were informed that the loan documents were
incorrect and had to be resigned.  (Manville Decl. ¶ 9.)  Helen
Manville declares that Plaintiffs then received loan documents with
the wrong borrower's names twice.  Plaintiffs attempted to contact
Countrywide to straighten out the paperwork and to ascertain the
amount of the monthly payments but were unable to reach anyone at
Countrywide until January 9, 2008.  Helen Manville declares Plaintiffs
spoke with Porshi Jones at extension 9610, and Jones stated she would
"look into the matter and call [Plaintiffs] back."  (Manville Decl. ¶
10.)  Helen Manville declares Plaintiffs did not hear from Countrywide
again until the week of April 14, 2008, when Plaintiffs received a

voicemail on their home telephone.  Plaintiffs returned the call but were unable to contact anyone and had to leave a voicemail message. (Manville Decl. ¶ 11.)

Shanthi Premachandra, a senior case management litigation liason at Countrywide, declares that Countrywide has not received any payments after Plaintiffs' $2,527 cashier check.  (Premachandra Decl. ¶ 19.)  Thus, Countrywide had a second Notice of Default recorded with Nevada County on April 30, 2008.  (Premachandra Decl. Exh. Q.)  On April 30, 2008, Plaintiffs received a notice of foreclosure against their property, in which the foreclosure was scheduled to proceed on August 21, 2008.  (Manville Decl. ¶ 11; see also Compl. Exh. I.)

On August 17, 2008, Plaintiffs filed a verified Complaint, in which the following claims are alleged against Defendants: violations of the Truth in Lending Act ("TILA"), codified at 15 U.S.C. § 1601 et seq. and Regulation Z, 12 C.F.R. § 226.1 et seq.; violations of the Real Estate Settlement Procedures Act ("RESPA"), codified at 12 U.S.C. § 2601 et seq. and Regulation X, 24 C.F.R. § 3500.1 et seq.; fraud; unconscionability; breach of contract; violation of unfair competition law; and negligent misrepresentation.

At the October 6, 2008 hearing, Plaintiffs' counsel indicated he had not been given an opportunity to respond to Defendants' opposition.  This is incorrect.  The TRO provided Plaintiffs with an opportunity to file a Reply, but Plaintiffs' counsel did not preserve that opportunity in the parties' stipulation that continued the PI hearing; nor did he seek the opportunity before the PI hearing.

Plaintiffs' counsel was asked during the October 6, 2008 hearing, about Plaintiffs' failure to make a loan payment since

October 2007, and whether Plaintiffs should be required to make a loan payment should they prevail on their PI motion.  Plaintiffs' counsel responded yes, and stated the loan payment should be no more than $1,000 per month because Owen Manville lost his job and Plaintiffs could not afford a higher monthly note.

LEGAL STANDARD

"To obtain [preliminary] injunctive relief, the movant must demonstrate either: (1) a combination of probable success on the merits and the possibility of irreparable harm, or (2) that serious questions are raised as to the merits and that the balance of hardships tips in its favor."  Dept. of Parks & Recreation for State of California v. Bazaar del Mundo Inc., 448 F.3d 1118, 1123 (9th Cir. 2006) (citing Arcamuzi v. Cont'l Air Lines, Inc., 819 F.2d 935, 937 (9th Cir.1987)).

"'These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases.'  If the plaintiff shows no chance of success on the merits, however, the injunction should not issue.  As an 'irreducible minimum,' the moving party must demonstrate a fair chance of success on the merits, or questions serious enough to require litigation.  Under any formulation of the test, the moving party must demonstrate a significant threat of irreparable injury.  Arcamuzi, 819 F.2d at 937 (internal citations and citations omitted).

ANALYSIS

Defendants argue Plaintiffs are not likely to succeed on any claim.  Plaintiffs aver under TILA that the Good Faith Estimates, Truth in Lending disclosure statements, and other documents provided to them did not properly disclose the August 2006 loan.  (Compl ¶¶ 33-

8

49.)  Defendants counter Plaintiffs' TILA claims fail because they "are barred by the [one-year] statute of limitations," citing 15 U.S.C. § 1640(e), which provides, "Any action under this section may be brought . . . within one year from the date of the occurrence of the violation"; and Katz v. Bank of California, 640 F.2d 1024, 1025 (9th Cir. 1980), in which the Ninth Circuit held the statute of limitations begins to run upon the lender's "actual disclosure" of the terms of the loan.  (Opp'n at 9:21-25.)  Plaintiffs' Complaint was filed over a year after the last loan document was disclosed to Plaintiffs, which was the Settlement Statement dated August 23, 2006. (Premachandra Decl. Exh. E.)  Hence, Plaintiffs have not shown that they have probable success on the merits of their TILA claims.

        Defendants also argue Plaintiffs' claims under RESPA fail because "[t]here is no private right of action under RESPA for the violations alleged . . . ."  (Opp'n at 4-5.)  Plaintiffs aver 12 U.S.C. §§ 2603, 2604, and 2605 of RESPA have been violated.  "The structure of RESPA's various statutory provisions indicates that Congress did not intend to create a private right of action for disclosure violations under 12 U.S.C. § 2603."  Bloom v. Martin, 865 F. Supp. 1377, 1384 (N.D. Cal. 1994), affirmed on other grounds by 77 F.3d 318 (9th Cir. 1996).  Also, "there is neither an express nor implied private right of action for violations of § 2604."  Walker v. Artisan Mortg., LLC, No. CV-08-0106, 2008 WL 2026365, at *3 (D. Ariz. May 9, 2008) (citing Collins v. FMHA-USDA, 105 F.3d 1366, 1367-68 (11th Cir. 1997)); see also McCulloch v. Great Western Bank, NO. C97-1422WD, 1998 WL 34013543 (W.D. Wash. Feb. 11, 1998) ("No private right of action is available for violating the disclosure requirements of RESPA § 5(c) [12 U.S.C. § 2604(c)]." (citing Collins, 105 F.3d at

1367-68)).  Therefore, Plaintiffs have not shown they have a viable
private right of action under §§ 2603 and 2604.  However, "Section 6
[of RESPA, 12 U.S.C. § 2605] specifically provides for a private right
of action for violations of its provisions."  <u>Bloom</u>, 865 F. Supp. at
1384 n.10 (citing 12 U.S.C. §§ 2605(f)).  Plaintiffs aver that
Defendants violated 12 U.S.C. § 2605 by failing to respond to
Plaintiffs' "qualified written request of May 30, 2008." (Compl. ¶
48.)  However, Premachandra declares "[t]here is no indication that
Countrywide received any communication dated May 30, 2008, from the
Manvilles or their representative." (Premachandra Decl. ¶ 20.)
Plaintiffs have not submitted the May 30, 2008 letter as an exhibit.
Defendants further contend Countrywide appropriately responded to a
letter from Plaintiffs dated June 30, 2008 within 20 working days, as
required by § 2605(e)(1). (Premachandra Decl. Exh. K; Opp'n at 15:12-
16.)  This position concerning the June 30 letter has not been
disputed.  Since Plaintiffs' present injunctive relief request does
not appear available under the statute (<u>See</u> 12 U.S.C. § 2605(f)(1)),
Plaintiffs have not shown probable success on their RESPA claims.

        Defendants also argue Plaintiffs are not likely to succeed
on their California fraud claim.  This fraud claim includes the
averment that "Plaintiffs . . . relied upon defendants' . . .
professional advice." (Compl. ¶ 54.)  Defendants counter since Owen
Manville was an experienced loan officer, he was not "duped into an
unfavorable loan that he could not understand." (Opp'n at 1:11-13.)
The elements of fraud are: (1) misrepresentation, (2) knowledge of
falsity, (3) intent to defraud, i.e., induce reliance, (4) justifiable
reliance, and (5) actual damages.  <u>Conrad v. Bank of Am.</u>, 45 Cal. App.
4th 133, 156 (Cal. App. 1996).  Reliance must "have been reasonable in

light of the plaintiff's 'intelligence and experience.'" <u>Gen. Am.</u>
<u>Life Ins. Co. v. Castonguay</u>, 984 F.2d 1518, 1520-21 (9th Cir. 1993)
("Given General's sophistication . . . no rational jury could have
found that General behaved reasonably [in relying on the defendant's
statements].").  In light of Delgadillo's averment about Owen
Manville's sophistication as a loan officer, and the lack of any
contrary evidence in the record, Plaintiffs have not shown they are
likely to prevail on this portion of their fraud claim.

Plaintiffs also aver "Defendants . . . deliberately
misrepresented the cost of the loan[;] the APR, the required fees, the
closing costs and other fees that would cause the loan amount to be
higher." (Compl. ¶ 51.)  Helen Manville declares Delgadillo "promised
a loan with a 7% interest rate fixed for 7 years," but Plaintiffs
ultimately obtained an 7.25% interest rate.  (Manville Decl. ¶¶ 3, 5.)
However, Delgadillo declares that on July 28, 2006, Delgadillo told
Owen Manville that the interest rate would be 7.25%.  (Delgadillo
Decl. ¶ 17.)  Delgadillo declares that the 7.25% interest rate was
generated by Countrywide's system and not based on any discretionary
decision by him.  (Delgadillo Decl. ¶ 16.)  The exhibits attached to
Plaintiffs' Complaint show that Plaintiffs were provided with a first
Good Faith Estimate ("GFE") on August 2, 2006 and a second GFE on
August 18, 2006, both of which state a 7.25% interest rate.  (Compl.
Exhs. B, C.)  Although Helen Manville's averment contradicts
Delgadillo's averment on what was said about the interest rate, the
documents attached to Plaintiffs' Complaint supports Delgadillo's
averment.  Therefore, Plaintiffs have not demonstrated they have
probable success on the merits of this issue.

Plaintiffs also aver that the "loan discount [fee] on this loan was fraudulent" because loan discount fees are not legitimate nor customary for variable-rate loans. (Compl. ¶ 38.) However, Delgadillo declares "[i]t is customary to add points [or loan discount fees] in . . . adjustable-rate mortgages." (Delgadillo Decl. ¶ 18.) Delgadillo also declares he informed Plaintiffs about the loan discount fees. (Delgadillo Decl. ¶¶ 17, 22.) The loan discount fee was also disclosed in the GFEs. (Compl. Exh. B, C.) Plaintiffs have not shown that TILA prohibits loan discount fees on variable-rate loans. TILA defines "any amount payable under a point, discount, or other system of additional charges" as a type of "finance charge" to be disclosed as part of TILA disclosures. 15 U.S.C. § 1605(a)(1). Accordingly, Plaintiffs have not shown probable success on the merits of this issue.

Plaintiffs also aver the GFEs are misleading because the first GFE stated a 1% loan discount fee while the second GFE stated a 1.25% loan discount fee. (Compl. ¶ 39 & Exhs. B, C.) Further, Plaintiffs aver that they "were never informed as to the reason for the loan discount [or] that the rate had gone up before closing . . . ." (Compl. ¶ 39.) Defendants counter that the increase in the loan discount fee was explained and accepted by Plaintiffs. (Opp'n at 5:3-7; Delgadillo Decl. ¶ 19-22.) Delgadillo attests, according to Countrywide's appraisal report, the value of Plaintiffs' home, which served as security for the loan, was lower than the value originally reported by Plaintiffs. (Delgadillo Decl. ¶¶ 19-21.) Delgadillo requested Countrywide to approve the loan secured by the lower value of the property. (Delgadillo Decl. ¶ 21.) Defendants have submitted the Structured Loan Desk Exception Summary generated by Countrywide,

in which Countrywide approved the loan on the condition that the loan discount fee be increased by an additional 0.25%. (Delgadillo Decl. Exh. A.)  Delgadillo declares he informed Owen Manville of this increase and Owen Manville agreed to it.  (Delgadillo Decl. ¶ 22.) Further, the second GFE, which was provided to and signed by Plaintiffs on August 18, 2006 and was submitted as an exhibit to Plaintiffs' Complaint, stated that the loan discount fee was 1.25%. (Compl. Exh. C.)  The documents in the record do not support Plaintiffs' position.  Accordingly, Plaintiffs have not shown probable success on the merits of this issue.

Plaintiffs also aver that the final Truth in Lending disclosure statement dated August 18, 2006 was inaccurate because it listed the wrong figures for the APR, finance charge, amount financed, total payments, and highest monthly payment.  (Compl. ¶ 22-23 & Exh. E.)  Specifically, Plaintiffs aver the "maximum APR over the life of the loan" is approximately 9.477%.  (Compl. ¶ 23.)  Defendants counter that the 7.654% APR shown on the final Truth in Lending disclosure statement was "calculated based on the initial fixed rate," which was 7.25% for the first seven years, relying on the official commentary to 12 C.F.R. 226.17(c), which provides, for variable rate loans, "[c]reditors should base the disclosures only on the initial rate and should not assume that this rate will increase."  (Opp'n at 12:21-22.) However, this commentary also provides, "in a variable-rate transaction with . . . a discounted . . . rate, disclosures should not be based solely on the initial terms.  In those transactions, the disclosed annual percentage rate should be a composite rate based on the rate in effect during the initial period and the rate this is the basis of the variable-rate feature for the remainder of the term."

Commentary to 12 C.F.R. 226.17(c)(1) ¶ 8.  Plaintiffs paid a loan discount fee in this loan.  (Compl. Exh. B, C.)  Thus, it appears that Defendants should have disclosed a "composite rate," not a rate merely based on the initial 7.25% fixed interest rate.  However, the Interest Only Adjustable Rate Note, which was provided to and signed by Plaintiffs on August 18, 2006, and which Plaintiffs have submitted as an exhibit to their Complaint, stated that the interest rate would be fixed at 7.25% for the first seven years, and would thereafter be adjusted according to the "LIBOR" index.  (Compl. Exh. H.)  Since Owen Manville had experience as a loan officer, and Plaintiffs have not explained why he did not understand that the interest rate would be adjusted according to the "LIBOR" index, the record does not show that Plaintiffs have probable success on the merits of this issue.

Plaintiffs also aver the preliminary and final Truth in Lending disclosures are "false and misleading" because these disclosures stated a loan amount that was less than the $375,000 loan they requested.  (Compl. ¶ 40 & Exhs. D, E.)  However, ultimately, Plaintiffs did receive a loan for $375,000, as evidenced by the Interest Only Adjustable Rate Note, signed by Plaintiffs, and the Settlement Statement.  (Compl. Exh. H; Premachandra Decl. Exh. E.)  Since Plaintiffs received what they requested, they have not shown probable success on the merits of this issue.

Plaintiffs also aver they were misled about the closing costs, since the estimated closing costs on the first GFE were $7,559.38, while the ultimate closing costs were $10,570.17; a difference of $3010.79.  (Compl. ¶ 45(c) & Exh. B.)  A Settlement Statement, submitted by Defendants, shows closing costs to be $10,570.17.  (Premachandra Decl. Exh. E.)  Defendants counter "[m]uch

of this disparity . . . exists because the [loan discount] increased after the first GFE . . . ." (Opp'n at 10:26-11:2; Premachandra Decl. Exhs. C, E.)  The first GFE provided a $3,750 loan discount fee, while the second GFE provided $4,687.50. (Compl. Exh. B, C.)  The difference between the loan discount fees is only $937.50, which does not fully account for the $3010.79 difference between closing costs on the first GFE and that ultimately paid.  However, the second GFE, which was signed by Plaintiffs on August 18, 2006 and attached to the Complaint, estimated closing costs to be $13,167.19, which is even higher than the ultimate closing costs. (Compl. Exh. C.)  Since the second GFE disclosed the closing costs before the loan closed, Plaintiffs have not shown probable success on the fraud claim.

        Plaintiffs aver that the loan agreement was unconscionable because "plaintiffs' loan will actually cost them $1,319,832.12, not the $1,016,353.27 plaintiffs were informed[; and that this] is a difference of $303,478.85, undisclosed by defendants." (Compl. ¶¶ 57-58.) "'Procedural unconscionability' concerns the manner in which the contract was negotiated and the circumstances of the parties at that time.'  The relevant factors are oppression and surprise." Abramson v. Juniper Networks, Inc., 115 Cal. App. 4th 638, 656 (Cal. App. 2004) (internal citations omitted).  "'Substantive unconscionability' focuses on the terms of the agreement and whether those terms are so one-sided as to 'shock the conscience.'" Id. (citations omitted). The preliminary and final Truth in Lending Disclosure Statements attached to Plaintiffs' Complaint provided the costs to be $1,024,716.60 and $1,016,353.27, respectively. (Compl. Exh. D, E.) During the October 6, 2008 hearing, Defendants' counsel was asked about Plaintiffs' position on the $1,319,832.12 loan cost figure.

Defendants' counsel explained that Plaintiffs calculated that figure by assuming that, after the initial seven years with the fixed interest rate, the interest rate would jump to and remain at the maximum interest rate possible, 12.25%.  Plaintiffs' position on the $1,319,832.12 loan cost figure does not appear supported by Exhibit H attached to their Complaint, which is the Interest Only Variable Note. The Note does not convey that the interest rate would jump to 12.25% after the first seven years, but rather states that the interest rate would be adjusted based on the "LIBOR" index.  (Compl. Exh. H.)  In light of the record and the legal standard, Plaintiffs have not shown probable success on the merits for their unconscionability claim.

Plaintiffs aver Defendants breached the loan modification agreement by not reinstating Plaintiffs' mortgage and starting foreclosure proceedings against Plaintiffs' property.  (Compl. ¶¶ 60-63.)  After Plaintiffs were in default on the loan, Countrywide agreed to a loan modification on October 15, 2007.  (Manville Decl. ¶ 7 & Exhs. I & J; Premachandra Decl. Exh. P.)  Plaintiffs paid the requested $2,527 to reinstate the mortgage on October 23, 2007. (Manville Decl. ¶ 7 & Exh. K.)  Helen Manville declares, however, in early December, Plaintiffs received another loan modification agreement from Defendants dated November 27, 2007, which demanded $5,224.50 to reinstate the mortgage.  (Manville Decl. ¶ 8.) Plaintiffs have not submitted the loan modification agreement dated November 27, 2007. Plaintiffs attempted to get clarification from Countrywide on the November 27 agreement, but Countrywide did not return Plaintiffs' telephone calls.  Ultimately, Plaintiffs received a foreclosure notice on April 30, 2008.  (Manville Decl. ¶ 12 & Exhibit, not labeled.) Defendants counter with Countrywide's Notice of Rescission dated

16

1  November 13, 2007, which rescinded the earlier default against

2  Plaintiffs. (Premachandra Decl. Exh. R.)  However, Countrywide never

3  received any further loan payments since Plaintiffs' October 2007

4  payment of $2,527 (Premachandra Decl. ¶ 19.); thus, on April 30, 2008,

5  Countrywide recorded another default against Plaintiffs.

6  (Premachandra Decl. Exh. Q.)  The record indicates that the current

7  default situation Plaintiffs face and the attendant looming

8  foreclosure threat resulted from Plaintiffs' failure to make loan

9  payments on the loan modification agreement dated October 15, 2007.

10  Accordingly, Plaintiffs have not shown probable success on the merits

11  of their breach of contract claim.

12         Plaintiffs also aver Defendants violated California's unfair

13  competition law, by "engaging in predatory lending . . . including

14  falsification of loan application information," by violating TILA and

15  RESPA, and by "[failing] to rescind the illegal loans promptly on

16  request."  (Compl. ¶ 66.)  Unfair competition is defined as any

17  "unlawful, unfair or fraudulent business act or practice."  Cal. Bus.

18  & Prof. Code § 17200.  "An action based on § 17200 to redress an

19  unlawful business practice essentially 'borrows' violations of other

20  laws and treats them as independently actionable."  Premier Technical

21  Sales, Inc. v. Digital Equipment Corp., 11 F. Supp. 2d 1156 (N.D. Cal.

22  1998).  As discussed above, it is not likely that Plaintiffs will

23  succeed on any of the above discussed claims.  Further, Plaintiffs

24  have not shown that Defendants' practices are "unfair."  Accordingly,

25  Plaintiffs have not shown probable success on the merits of this

26  claim.

27         Finally, Plaintiffs aver Defendants are liable for negligent

28  misrepresentation.  (Compl. ¶¶ 68-70.)  But for the reasons shown

above, Plaintiffs have not shown probable success on the merits of
this claim.

For the stated reasons, Plaintiffs have not shown probable
success on the merits of their claims, and their stated irreparable
injury appears to be the result of their own making.  Accordingly,
Plaintiffs' motion for a preliminary injunction is DENIED.

Dated:  October 8, 2008

GARLAND E. BURRELL, JR.
United States District Judge